Good morning. May it please the Court, Jordan Gross and Angelo Calfo on behalf of Wade Cook. Mr. Calfo and I are sharing oral argument this morning, so with the Court's leave, I will confine my remarks to the Confrontation Clause issue, and Mr. Calfo will present the remaining issues on the appeal and our rebuttal argument. If you'd like to reserve five minutes for rebuttal, Your Honor. My two o'clock. Is there more than one defendant? I'm sorry. No, there isn't, Your Honor. Despite the government's arguments to the contrary, this is not a case built on rock-solid evidence. Mr. Cook's conviction rests on a foundation of improperly obtained evidence, evidence admitted in violation of his Confrontation Clause rights, the exclusion of highly exculpatory evidence, and finally a forced jury verdict. In short, this is a conviction that was obtained only by violating his confrontation and other constitutional rights. With respect to the Confrontation Clause issue, this case involves a straightforward application of settled law. Crawford set down a bright-line rule, and Crawford could not be clearer. A trial court cannot admit the testimonial hearsay statements of an unavailable witness unless the defendant has a prior opportunity to cross-examine the witness, and that's exactly what happened here. The trial court's ruling flies in the face of Crawford, and it's a good example of exactly the danger Crawford said the Confrontation Clause was aimed at avoiding. Mr. Cook was convicted based on evidence of his wife's statements that were listed from the government in a sworn statement pre-trial, and he had no opportunity to cross-examine her at trial. Didn't he adopt those statements when he offered up the testimony together with her pre-trial? And they went in together. They signed a waiver that said they wouldn't object to the statements being used against them, plural. They signed a ñ they signed ñ are you talking about the stipulation, Your Honor? I don't recall it was called a stipulation or whatever, but whatever agreement they entered into when they went in to make the testimony. When they went in to make the testimony, they stipulated that their statements could come in against themselves, not against each other. There's no stipulation that Wade Cook said ñ You usually have a co-conspirator. You're talking about snakes looking out for their own interests against each other, and this pair appears to be cooperating at every stage, offering this testimony to the government together in hopes of fending off indictment. And I don't see anything different in her story that's inconsistent with his. In the end, I mean, I guess I ñ let me focus on that. What is it exactly in her testimony that turns out to have been disputed at trial? Well, let's look at what Laura Cook said and what Wade Cook said. I think it's really imperative to understand that Laura Cook's statement is the vehicle for the admission of the new promissory note. Back to the proper for a minute, because I have to say I'm reading it differently than you suggest it reads.  Any such meeting would provide the Cooks with the opportunity to tell us in their own words about their conduct in running various entities and in particular their apparent evasion of substantial federal income taxes. Any such meeting, however, would be without proper protections, and if one or both of the Cooks were subsequently charged with federal criminal tax offenses, statements made during this meeting could be used against them. So they're not saying anything about, you know, we're not going to use her statements against him or his statements about her. They're broadly saying any statements made by anybody could be used against either one of them. I would read it as if they could be used against them individually. If you had wanted to read it so narrowly, shouldn't you have written back and said, no, you know, you can't use any statements made, for example, Mrs. Cook chooses not to testify. You can't use her statements against him. I would submit to Your Honor, first of all, this never came up at the trial level. This was never a ground, in my recollection, for the government keeping this out. And I think the confrontation clause in the Crawford issue is clearly preserved. The fact that they went in and talked to the government separately and said these, we would interpret it as they can be used against me and used against her, but they certainly, there is no clear unequivocal waiver of their constitutional right to confrontation. I think it takes a little bit more than that to hold, following the trial, that that was a clear waiver of a constitutional right. Why would it take? Why would it take? I think it would take, the Cooks hereby acknowledge that the statements of each other could be admitted against them, and they hereby waive any claim to constitutional confrontation clause error. And Crawford exists at that time. I think it would be incumbent on the judge to make that finding, certainly, and it would certainly be incumbent on the government to make that argument, and that simply was made. Why was it just not harmless anyway? As I read the record, Cook testified himself. He signed a promissory note to New for $3 million. Cooks borrowed the money from New and documented transfers as loans, and the note was drafted years ago. Also, there was testimony that the note was created on Laura's computer after the government initiated its investigation. So why isn't it harmless in any event? Well, let me address that, Your Honor. And it occurs to me this morning that the government gave us a chart that really kind of goes through what they suggest is cumulative, what they suggest is corroborative, what Your Honor is suggesting. And as a threshold matter, I would suggest that the government is asking you or has asked you to apply the wrong harmless error test, because they're asking you to look at the strength of the government's case, the corroborating evidence. And I would suggest in this case that where there's a complete exclusion of the ability to cross-examine a witness, the test is really whether the tainted evidence contributed to the conviction and whether the government can prove beyond a reasonable doubt that there's no reasonable probability that that happened. Well, when you look at this evidence, when you look at this evidence, which comes in outside of this particular evidence you suggest wasn't waived, which there's a good question whether it was, then you have to say, well, since we got this other evidence, that is equally probable could be done beyond a reasonable doubt. I honestly, I respectfully disagree that you get to look at the other evidence. You look at whether there is a reasonable probability that the tainted evidence could have contributed to the verdict. Well, just a minute, counsel. Cite me the case for that. The case that I look at says that if I'm going to take this evidence out, I have to take it out of the case, make sure that it isn't there, and suggest if there is other evidence which could make the government's case if they had none of that evidence in there. And that's what I did. And, Your Honor, I was... And if you have another case that says that's not the way I'm going to go about it, cite it. Your Honor, United States v. Vargas, 933... Well, I read Vargas. I don't think it says that. In Vargas, it does distinguish between the two confrontation clause situations, the one where the judge restricts your ability to go further into witness's bias for impeachment purposes. Under that, they say, yes, you look at all the other evidence. They say, but when you have this kind of case where there is absolutely no cross-examination whatsoever, you look at the contribution to the verdict, and that's what you look at. And they... In order to get to the contribution to the verdict, you have to take it out to suggest that there is evidence that wouldn't get there if you didn't have it. Otherwise, it can't contribute. Well, and here's how it contributed. So let's look at Laura's statements and let's look at Wade Cook's statements. What Wade Cook says is he comes in and he tells the government that Laura drafted the new promissory note. They both signed it maybe four or five years ago, possibly later, four or five years prior to the interview, and that he believes that loans existed whether or not they're documented. What does Laura Cook tell the government? She says she and Wade had the promissory note drafted. She says she and Wade had the promissory note... I don't think I understand the difference because the problem really isn't the mechanics of preparing the promissory note. The problem is that neither one of them acknowledged the existence of such a debt in dealing with other parties. And I'm at a loss as to figure out what all the details about preparing the promissory note have to do with the verdict. Well, here's how it has to do with the verdict. It goes to the extent of involvement, and more critically, it goes to intent and motive. The problem here isn't whether Wade Cook was involved. Nobody can look at these facts and decide that Wade Cook was the outlier who really didn't know what was going on. The man's at the center of things. The issue is whether his wife knew what was going on. So to tell me that she testified in a way that he didn't have a chance to contradict when I haven't figured out anything he's trying to contradict in what she said just has me at a loss. What would he contradict? What does he dispute in her testimony? Well, he can dispute in her testimony his extent of involvement. Let's bear in mind... Yeah, but that's not the problem with the verdict, because there's no problem with the other evidence figuring out he's the guy at the center of things. If you're telling me that the jury had to hang on her testimony to believe that he was involved in this, I'm telling you I think there's sufficient evidence elsewhere to make that harmless error. If that's all you've got to offer up in terms of what Laura's testimony was, because he was at the center of this. And the question is, did it contribute to the verdict? And here's how it contributes to the verdict. Without Laura Cooke's statement, there is no obstruction, because the obstruction charges, she came in, she delivered the document, and everybody – Wade Cooke said and said, yeah, maybe that – you know, that they – first of all, I think it's important to realize that he was never shown this document. He never had a chance even to discuss it with the government. So he comes in and says, well, yeah, it might have been created some other time, possibly later. And also, I think the intent and the motive... Well, the obstruction is that they present it as being bona fide, and the jury plainly decided it wasn't bona fide. That's the obstruction. And he came in and he said, well, yeah, maybe it was dated some other time. That was the critical issue, was the backdating. And I think it's important not to lose sight of the fact that the government took this testimony and bootstrapped willfulness for the tax fraud claims using the obstruction of justice – using the obstruction of justice statements.  The allegations cut to the heart of our obstruction charges, and they are incredibly important. They are core allegations to the issue of willfulness. The issue of trial... I don't want to tell you and your co-counsel how to pursue the case, but I suggest spending some time on the Allen instruction would be useful. And you've already used now 11 of the 20 minutes. Okay. So with that, I will – if the Court has no further questions on the confrontation apology. Thank you. I'm going to follow right behind my counsel so I don't lose any time. Thank you for the Court's indulgence in allowing us both to argue. The series of events that led to the split verdict in this case is unusual. And I think the climactic moment here is when the jury came back with its second note to the judge in which it said, we, the jury, are not in agreement on each response. And it's important to note that at that point, this is a jury that had already declared itself deadlocked once. It had also been given a dynamite charge or an Allen charge at that point. And it didn't give a second Allen charge. It only questioned the jury and then told them to go back to deliberate. That's right, Your Honor. And what the judge did, though, and this is – if I could follow up on the first thing the judge did, though, Your Honor, I think it's important for context to the point you are making, and that is this. Well, I was just trying to put it in context because if it were two Allen charges, I think I have sufficient precedent to say that's not good. We don't have two Allen charges here. We have an Allen charge in the first instance. Then they deliberate some more for several times. Then we have a second situation where the judge doesn't give the Allen charge but merely questions the jury and then says go back to deliberate. And what I'm really looking at, I guess, on this is the standard of review again, abuse of discretion. And did what the judge do in this particular instance, who he says it's a mere clarification, is it so bad that I think he abused his discretion? Two points, Your Honor. First, we agree that they did not give – the judge didn't give a second Allen – formal Allen charge. However, it's our viewpoint that the second direction to go back and deliberate was a coercive event. Did he call it an Allen charge? The only reason it's a coercive event in your mind is because they came back within five minutes. Is that the only idea? No, Your Honor. What else? Well, Your Honor, at the point the judge asked the jury to go back, he'd already given them one Allen charge. Yes. The jury had come back and said we're deadlocked again. After a long time. Well, Your Honor, one day. All right. That seems long. Having taken a lot of jury verdicts, another day of deliberation is a long time. Your Honor, I agree. Five minutes, that's the concern I have. A day is a long time. I'm just going back to your biggest idea is, as I understand your argument, that five minutes is just too short because there's case law to suggest that short time period makes it very coercive. But I'm suggesting to you we have an abuse of discretion standard. We have an Allen instruction given a day before this happens. We have them come out and the judge merely questions the jury as to what they think about this situation and says go back to deliberate. And then within five minutes, they come back. And when they come back, they don't convict everyone. They don't do that. They come back upon viewing, they return the verdict against Wade Cook and only one count and no counts against Laura Cook. And I have to suggest that that five minutes is enough. Now, to put it right out to you, that's what you have, Your Honor. I hate to take your time doing it. That's why I was asking. Well, between you and my counsel, I've got very little left. But, Your Honor, let me say this. You know what? Five minutes is enough to reach a verdict. I was a federal prosecutor, tried a lot of cases. A reentry after deportation, they could do it in five minutes. We used to call it a single latte verdict. I mean, you go back, get a cup of coffee, go back. The problem here, Your Honor, is that the judge, in this case, said they did not have time to deliberate. He said they did not have time for any substantive deliberation. So if you, Your Honor, are going to take the position here on appeal that they went back and deliberated for five minutes and came to an eight-count verdict against my client on three weeks' worth of evidence, you are in contradiction to the statement of the trial court judge. Secondly, Your Honor, the issue is not abuse of discretion. And I'll go back and look at my briefs. But my recollection from looking at the briefs is that both the government and the defense lawyers agree that it's a de novo review as to whether or not the mixed question of law fact. It's a de novo review on whether the court instructs the jury correctly? No, Your Honor. It's a de novo review. It's a mixed question of law and fact as to whether there was coercion of the jury. And so I do – I would ask, Your Honor, to look at it afresh. I think there was an earlier argument here where the court said, you know, we wouldn't be doing our job if we didn't take a look at it. Again, I think the same thing is true here. And here's the critical thing, Your Honor, that's so important. When the trial judge sent the jury back – and this is what he said. They had already gotten an Allen charge. Okay? And we know at that point the case law is very clear. This is sensitive area for the trial judge to be in. You've given this jury a charge that says the minority of you have to go back and reexamine your views. I want you to listen to the other jurors. Take another look at it. That statement in the Allen charge is viewed as on the brink of impermissible jury coercion. So when the jury comes back a second time and they say we're deadlocked, we're on – we're playing with fire at this point. What does the judge do when the jury – four jurors come back and they say, Your Honor, we are hopelessly deadlocked. We listened to your Allen charge. We still can't reach a verdict. What does the judge say to those four jurors? And I've got the quote. He says, all of you members of the jury – all I did was pull them. All of you members of the jury, go back to the jury room to deliberate. I instruct you to go back and deliberate. He didn't say instruct. I'm going to ask all of you to return to the jury room and continue your deliberations. That's about as barren as it can be. It doesn't say much of anything except you're stuck. You're in there for a while longer. It would be barren, Your Honor, in and of itself. But an Allen charge has been given. And four jurors have said we're hopelessly deadlocked. What does he say to those four jurors? Go back. Well, the law about polling isn't that one deadlocked juror is enough to say that's the end of the game. We don't have laws saying how many is too many. But I suggest that it's not quite so compelling, particularly the scenario you're hearing. I've got to say, I've struggled with this. I've read that transcript many times. I'm trying to figure out what's going on here. And the only thing that makes sense to me is that particularly where four say one thing and then the next eight say something different is and several of the jurors said they didn't really understand the question, they were confused, that my speculation is that, yeah, they were confused and the focus was on, well, what happens if we can agree on some and not agree on others? Because what happens five minutes later is exactly that. They do agree on some and don't agree on others. Yes, Your Honor. Why shouldn't we say that's what was going on here? And you don't have any coercion, which is the problem that you're concerned with. I've got six reasons. Okay. The first one, Your Honor, is that one of the first instructions this jury got was the following. You must decide the case on each defendant separately. Your verdict on any count should not control the verdict as to any other defendant. Okay. I mean, that's as clear as day. Then they get a verdict form. Look at the verdict form. How could anybody, especially when you've got 12 bright people, not look at that verdict form and know that you answered the question separately? Third, after the judge got the first deadlock notice, the judge on his own initiative, without any request by me, without any request by the government, instructs them again. You have to decide the case separately as to each defendant. And that's with an Allen charge, Your Honor. So then the jury comes back. What does the note say when it comes back? It doesn't say we can't reach a partial verdict. It doesn't say we can't reach a verdict as to all counts. It says we cannot reach a verdict. We are not unanimous on each response. And, you know, Judge Zille, who's a very good trial judge, asked him the question at that point, what did you mean when you said you're not unanimous on each response? The response of the court person is, Your Honor, I meant to say each verdict and response. Now, I'm sorry, but the next thing that happens after the jury goes back is they write another note. This is not a jury that went to law school. For the five minutes they were back in the jury room, what did they say? Your Honor, we've reached a partial verdict. We have reached a partial verdict. That's the first time this jury comes back with a verdict. And they came back with a verdict, Your Honors, because I'm afraid to say, I think this jury was not adequately advised when the judge told them to go back and deliberate to not compromise your individual judgment in order to reach a verdict. Because we know from the reasons I've just given, they're simply it would not be reasonable to say that this jury had reached a verdict before they came out the second time. What fact can the government point to? What fact? The problem that I have, and I don't know which way this cuts, is the judge himself says that they barely had any time in the jury room before they came back out deadlocked. I don't know how they had time to fill out the form. They didn't, Your Honor. So either the form was already filled out, in which case there was no coercive effect, or what? They didn't fill out the form, Your Honor. Who filled out the form? This is interesting, too, because they came back and said, we have a partial verdict. The judge brings them back out, and he asks them, have you filled out a verdict form? And they said, no. They had to go back and fill out the verdict form. So what happened in those five minutes? I mean, we could speculate, but certainly four jurors have been told, look, you've got to stay there. There's nothing that says they're not going to stay there for the rest of their lives. I mean, they don't know how long they have to stay back when they think they're hopelessly deadlocked. Somebody had to compromise. And look at the verdict form. It's a model of a solemnic decision on the part of the jury. They split the baby. I mean, you know, it's exactly the type of harm that we saw coming when the judge advised them in connection with an Allen charge to consider the defendant separate. When the poor judge said, I'm going to have these jurors come out now, and I'm going to ask the presiding juror if the jury is hopelessly deadlocked, and then I'm going to find by polling, is there any reasonable probability you can arrive at a verdict, and used a form that was substantially similar to one the Ninth Circuit has agreed to, and there was no objection at that point. There was no objection to the polling, Your Honor. No objection to any of that. He said that, and there was no objection which came up. I think he did the right thing. So he did it, and now after doing exactly what he said he was going to do, we're suggesting, again, that the poor old judge was wrong. No, Your Honor. I do not think the judge was wrong for polling the jury. What I do think the judge did that was wrong was after he found out that four jurors felt they were hopelessly deadlocked, he gave that, he did that. He told them to go deliberate. Well, what does Seawall say? Footnote 11 of the Seawall decision is what the judge should do, and he didn't do it. Footnote 11 says if there's another report of a deadlock, the judge doesn't have to declare a mistrial, but he has to make inquiry, reasonable inquiry, to determine whether or not there truly is and genuinely is a deadlock. Now, the judge didn't do that. What he had before him is a note that said we can't reach a verdict on any response in the verdict form. Four jurors saying I'm hopelessly deadlocked, eight saying I am. You've got a divided jury, Your Honor. Before they wrote that note that said we can't reach agreement on any response, somebody back in that jury room must have thought there was a deadlock. That poor person wrote a note to the judge. What the judge, according to footnote 11 of Seawall, ought to have done is sent the jury back solely for the purpose of coming back and telling him are they deadlocked? Because the fact of the matter is the note didn't say they were hopelessly deadlocked. The note said we're not unanimous. Then he brought them out, and for the first time the jurors were asked the question, are you hopelessly deadlocked? So they probably never heard that language before. Four of them said yes. Eight of them said no. So, okay, the judge now is at this point, this area where he's standing on the brink of impermissible collision. What does Seawall say to do? It doesn't say send them back. It says make a reasonable inquiry into whether they are truly deadlocked. And if they're deadlocked, the case is over. But I think he did exactly. He made an inquiry. You don't like his response to the inquiry. He decided eight jurors saying there's a reasonable possibility was a good enough reason to send them back, and Seawall doesn't say that's not a good enough reason. Well, Your Honor, then that's obviously you know what? There's so little case law on what this is. I mean, I must have read 100 cases over the weekend trying to figure out what a deadlocked jury is. But what I found is, you know, a deadlocked jury can be one juror saying I'm hopelessly deadlocked. A deadlocked jury – but the Ninth Circuit test, Your Honor, this is an important point, too, and that is there's a – there could be a conflation between what is a deadlocked jury under the Allen law and what is a – when a – when there's manifest necessity for a mistrial under the double jeopardy jurors' proofs. And I would ask the Court to distinguish between those two when it's analyzing this issue. Because in this case, the defendants did not object to a mistrial. So the manifest necessity standard goes by the wayside. The issue here is, is there a deadlock under footnote 11 of Seawall? And, you know, when I think if you've got four jurors saying you're hopelessly deadlocked and eight saying you're not, isn't that a deadlock? Isn't that saying to four jurors when you send them back in with no curative instruction at all, I don't – I gave you an Allen charge. You apparently didn't hear it. I want you to go back and reexamine your views. And that's what's so pernicious. He's telling those four jurors, I hear you saying you're hopelessly deadlocked. I've given you an Allen instruction. Go back and do it again. And that's what Jimenez v. Myers, which is a de facto Allen charge case, says. It's like when you do that, you're effectively asking the jurors to reexamine their views. And if you're going to do that, you've got to give some curative instruction. So if the judge in this case, for example, had sent them back and said, you know what? I'm going to send you back. You read this in a lot of the case law. I'm going to send you back. I'm not going to keep you there forever. Take a reasonable amount of time. I want to make sure you understand, do not give up your honestly held views about the case just in order to reach a verdict. If you read the Allen charge jurisprudence, that is the linchpin in every case where there's a claim of coercion. And what the Ninth Circuit has relied on consistently is a statement from the judge to the jury, don't compromise your honest beliefs about the case. All right, counsel. You're way over your time. I greatly appreciate the time you've given me, Your Honor. And I hope I have a few moments for rebuttal. I don't know about that. We gave you plenty of time. Good morning. May it please the court. My name is Bob Westinghouse. I represent the United States of America. To my left is Kurt Hermans, another assisting United States attorney. We were trial counsel. Let me address the issue of the Allen charge. Yes, I think that's a critical issue, frankly, from my perspective. First, Your Honor, counsel stood before you just a moment ago and said the court erred because it did not instruct the jury again after polling that it should not give up a reasonably held view. But Sewell stands precisely for the position that a second Allen charge is taboo. This was an experienced trial judge. He was following the pattern Ninth Circuit instruction. He read the deadlock instruction, 7.7, for me. In it, it states, however, you should not change an honest belief as to the weight or effect of the evidence. He had advised them of that. When he polls the jury, and Judge Smith, the record does reflect that there was no objection to the polling. When he polls the jury, he finds eight jurors telling him they are not deadlocked. He specifically, as an experienced judge would do, addresses the question of whether this is a case of manifest necessity, where he can deal with the situation by excusing the jury and avoid a double jeopardy claim down the road. I guess what bothers me is that after he polled the jury, unlike in Sewell footnote 11, it wasn't ambiguous as to whether the jury was deadlocked. There were four jurors who said it is deadlocked. I was a district court judge, too. First of all, giving an out on charge was something you would avoid by any means because of the very serious and delicate nature of the charge. Secondly, when you're told by four jurors that they are, in fact, deadlocked, and then you send them back, what is the message you're giving them without an instruction about do not hold? I mean, I'm not sure I would have even sent it back, to be honest. I wasn't sitting there. But what is the message you're giving other than, come on, guys, let's get it together and reach a verdict to those four jurors? What could possibly be the unharmful message here? I think the reasonable message to a group of 12 lay men and women is eight of our number have said that we're not deadlocked. The court is simply responding to that expression that there is reason to continue deliberations. I think quite to the contrary, Your Honor, the four jurors would have been shocked. The entire jury would have been shocked if it might have been given the opportunity to continue its deliberations. Doesn't it fly in the face of the whole jury deliberation system to ‑‑ I mean, the whole system isn't about majority rule. It's not about eight versus four. The deliberative system is about one person who honestly holds his belief can throw the whole thing out. Absolutely, Your Honor. The Supreme Court in Lowenfeld addressed precisely this situation where eight jurors initially responded to the court that they were not hopelessly deadlocked. The Supreme Court in Lowenfeld found that that was not an inappropriate response to send the jury back for further deliberations. Thereafter, it learned that, in fact, the jury was not eight for but ten to. And the Supreme Court continued to say that that was, in fact, appropriate. The knowledge by the district court that there are some jurors that believe that there is a deadlock and others that do not is not the same as knowing the standing. And it would be air to assume that, as counsel does, I submit, that the four jurors or, indeed, that any of the jurors believe that they did not have verdicts as to some counts when they responded to the court. Also, my understanding of what you're supposed to do from Sewell is you send the jury back. You don't make them stand up in open court so that everybody in the world knows which four are the ones not going along. So you send the jury back and you say, until I want an ambiguous message, are you, in fact, deadlocked or are you not? And the jury gets to discuss that question among themselves and then send another note back out to the judge. Your Honor, I respectfully disagree. The case of the United States v. C. teaches us that when the court is dealing with the question of a jury that appears to be unable to reach a verdict, it has the responsibility of inquiring further. It cannot accept the juror's statement without an independent determination, either by polling the jury or by individually or by asking for a collective response. Here the court did exactly what the pattern instruction 7.8 directs when a jury reports that they are deadlocked. That is, it attempted to make an independent determination to determine whether the fact of the deadlock was, in fact, correct. Okay. So then they go back and within five minutes, what, they sent out another note that they're deadlocked? No. They sent out a note that they had a partial verdict. Well, wasn't there first a note that they were deadlocked and then later a partial verdict note came? No. If I may direct your attention to the handout that I provided. I want to look at the record. What page? E.R. what? Yes, Your Honor. The record begins with respect to the first note on E.R. 561. The first note was received after approximately two and a half days of deliberation. It was on a Friday at 1 p.m. The jury had begun deliberating the prior Wednesday. The note read, Judge Zille, we, the jury, are not unanimous. Please advise. The court determined that that was clearly an indication that the jury, because of the length of deliberations and the note itself, needed assistance. And it chose to give the instruction that is then set forth. I should point out that the court did not ever tell the jury that it could return a partial verdict. And I respectfully submit that is important, because this is a jury that never understood that until they got back to the deliberation room after eight jurors had said they were not deadlocked. If I may, looking at the record, the next business day, so the Tuesday after a three-day holiday, President's Day weekend, the jury returned. And, again, Judge Smith is correct. It was approximately a day of additional deliberation. And they send out the second note. And this is found at ER 573. Judge Zille, we, the jury, with all 12 jurors, not in agreement on each response. Please advise. And what's significant is that when the judge then asked the foreperson the question, the judge states, Mr. Diaz, as the presiding juror, is it your opinion that the jury is hopelessly deadlocked as to each defendant and as to each count so that there's no reasonable probability that the jury can reach a unanimous verdict? I looked at Black's Law Dictionary in preparation for today. And Black's Law Dictionary defines the word verdict as the formal decision or finding made by a jury. I looked at Webster's, something that laymen would consider. And that defines verdict as the decision arrived at by a jury at the end of a case. Again, it's one decision. So when the foreperson is asked, can you reach a unanimous verdict, he states yes. And then it is significant if we move to ER. Well, you can't jump too far there because Judge Zille picks up on that and tries to clarify it. Now, I've already expressed openly my own sense, my inference is that that's what happened. But Judge Zille was aware of that. Absolutely. And he tries to clarify it. And he gets a clarification which appears to satisfy him that that's not the problem. Well, if I may, Your Honor, it is not, in fact, a clarification. Counsel, in his argument to the court just a moment ago, misstated the response of the foreperson. Again, the question was, do you mean a response both as to count one and all other counts as well? And the foreperson then responded, if I may add, Your Honor, I meant to say verdict, singular, and responses. Counsel, in his argument, submitted that the response was verdict and, excuse me, each verdict and response. That's not what the foreperson said. The foreperson said verdict. And then if we continue, we see the foreperson himself became confused because Judge Zille inadvertently changed the wording of the question. Again, looking at ER 577 and 578, the court states, first instructing each juror, I'm going to pull you and I want your answer to be limited to yes or no. You can't elaborate, yes or no, because he was, as every judge recognizes, in an area that is filled with potential danger. And he was trying to be as careful as he could be. He then said, all right, Mr. Diaz, juror number one, who happened to be the presiding juror as well, do you feel that there is a reasonable probability that the jury can reach a unanimous verdict on any count as to any defendant? You're sent back for further deliberations. So he modifies verdict as to any count, any defendant. And Judge Zille was clearly surprised because Mr. Diaz says yes. This is the foreperson who said that they could not reach a unanimous verdict when he's asked, can you reach a unanimous verdict as to any defendant on any count? He says yes. Judge Zille then says, well, let me ask the question again because I don't understand your response. Mr. Diaz said, maybe I misunderstood, Your Honor. And Judge Zille then asked a different question. The question is, do you feel there's a reasonable probability the jury can reach a unanimous verdict if sent back for further deliberation on any count as to any defendant? In other words, go back and deliberate about each defendant, each count, but can you reach a unanimous verdict? All right. And Mr. Diaz, when that question is asked, says no. Then the judge polls the jury, beginning with juror number two, and says same question. Mr. Scholl, no. Mr. Burke, no. Mr. De Los Santos, no. And then he comes to Mr. McNamara, juror number five. Mr. McNamara apparently is not quite as literal as his colleagues because he says, I would answer that question yes. Juror number six, Mrs. Moshegan, says, I'm still a little confused. The court, just a yes or no. I don't want, do you want the question read again? And Mrs. Moshegan says yes. And now the judge, in trying to restate the question, asked it exactly the same way he had initially asked it to the foreperson when the foreperson said we can reach a verdict. Okay. So wait a second. So then there's the third no, okay, at ER587. Third no. We have a verdict, essentially. No, no, no. This is the other no. We, the jury, are in unanimous agreement to some of the counts and hopelessly deadlocked on others. And the judge comments, this is at ER587, third no. That note is still ambiguous in the sense that we don't know yet whether there's third category where they haven't agreed or where they're not hopelessly deadlocked, and he goes on and on and on. Then he asks what the government's position is, and you concur. And then the defendant objects. When you send a jury back in after they've twice come out and said we can't reach a verdict, I don't know how many minutes it was since you sent them back out, and the court ultimately says it was probably between five or ten. And while he's listening to the defense objection following the third note, that's when, and the judge says it was closer to five minutes, right? That's when there's another buzz to his chambers, and he says they've indicated now they're unanimous. No, Your Honor, if I may interrupt, that's not correct. What am I reading from them? Well, the jury had already buzzed. I'm reading the transcript in order. No, I'm reading the transcript in order of what was going on in argument and what had happened in the record. What I'm attempting to say is you're going to tell me something that's not in the record? No, Your Honor. I'm simply saying that after the second note, after the polling of the jury, the jury went back for approximately five minutes. Counsel remained, and we were discussing with the court what should happen. Defense was objecting, and the buzzer rang. And that's when the note came back that said we have a partial verdict. The jury then came back, and the judge tried to clarify. Well, what the judge says is they've indicated now they are unanimous. As to some counts. That's correct, Your Honor. There was the third note was the note that said we have a partial verdict. I'm being – I'm giving the paraphrasing of it. We have. I'm paraphrasing. What the note indicates is that there's a unanimous agreement to some of the counts. Right. And the judge was then concerned. And hopelessly deadlocked on others. Right. And the judge was concerned. Well, does that mean there's some third category? And it never advanced beyond that point. And it never advanced. Note number three says we've got agreement on some. And that's it. Deadlocked on others. They wrote it up. They brought it back in that form. That's it, Your Honor. Absolutely. And just to complete this argument, the position of the United States is we must focus on was there coercion. And unless there's clear evidence of coercion, the court must affirm the giving of the evidence. And here's my problem. I've struggled through the process. And I've already said the inference I reached was the one that you articulated. Yes. But I wonder. I mean, we're sort of like reading tea leaves here. And is this the process we're supposed to go through when, in fact, there is at least some concern that the pieces don't entirely add up, the jigsaw puzzle doesn't fit together without some shoving into place? Should we be doing that shoving? Well, I think we have to look at the record yourself, Your Honor. And that's why I gave such focus to the colloquy between Judge Zille and the jury. Because it clearly makes, I believe, the case that the jurors had no understanding when they wrote the second note that a partial verdict was a possibility. They had been told to deliberate as to each count as to each defendant. But they had in mind, as any layperson would, that they had to reach one verdict. Because we talk in terms of, ladies and gentlemen of the jury, have you reached a verdict? So they didn't know how to proceed. And the polling, it's clear, I submit, establishes that, in fact, that was just what was going on in their minds. And finally, Juror No. 5, the light went off, and he then responded to that question, I would answer yes. I don't know. The foreperson tried to say that too. I think, Counselor, you're speculating a lot as to what was going on. Well, I'm looking clearly at the words, Your Honor. You're looking clearly at what the verdict form is called. It's called court's verdict. That's what the jury had with them, right? You sent them in with this verdict form? That's right. And that's exactly why the jury would be confused, because it says a verdict form. Right. No, it doesn't. It says court's verdict. But my point is singular, Your Honor. The reality here is this whole document is a verdict. Yes. And the jury did not understand. It was never told. There is nothing in the record that the jury was ever told that it could reach a partial verdict. That is, some counts it could decide, some counts it was unable to decide. I don't know if that's necessary to put that in the record. I mean, this is very clear. It says as to count one, and it asks questions. It's very clear you just go through this. Well, but, Your Honor, I think we have the trouble that we all view it as lawyers and not as laypeople. We can't be laypeople. Well, I don't think, with all due respect, that you can tell me how the laypeople on this jury. I think that's the problem. I understand. I included myself. My problem with it is, you know, how do you apply the law to a fact when you really don't know what's going on in the jury's mind? Well, but may I also add that we – the alternative is that this jury reached a very sophisticated verdict. They had deliberated for three and a half days, and counsel would have us – The jury isn't very long, considering the amount of – it wasn't a four-week trial, 18 boxes of exhibits. Well, it was 15 days of testimony, Your Honor. It's a huge trial. It was a very significant trial. So the amount of time really wasn't – But the reality, if I may conclude this point, Your Honor – Yeah. And that's the problem, too, is that there is the tension between, you know, wanting to say, oh, this is a violation of valen, given the overwhelming evidence. But we can't do that, either. No. But I may, if I may, simply finish this point. The jury reached a very sophisticated verdict, as I believe Judge Clifton noted previously. There was, in fact, eight separate counts. A conspiracy was count one. This jury was sophisticated enough to realize that when there were only two defendants charged in the conspiracy, Waycook and Loracook, it could not convict Waycook of the conspiracy if it did not convict Loracook. And so their ultimate partial verdict reflects that sophistication. They came back, and they said, we cannot decide count one. They found Waycook guilty of counts two through eight. They found no – made no decision with respect to Loracook as to the conspiracy or any other count. Counsel, again, not to speculate but to look at the record, counsel would have us believe that after three and a half days of deliberation, in one five-minute period, the jurors, one or more, walk into the jury room and say, all right, let's throw in the towel. The court's clearly insistent we reach a verdict. Let's do this. And in five minutes, they come up with this sophisticated response that takes into account all of the court's instructions. I respectfully submit that is simply not a reasonable interpretation. Moreover, language of the colloquy is examined carefully. I submit that each and every time the judge asked about a unanimous verdict, without modifying it specifically as to each defendant as to each count, the jury was confused. But when the judge asked, can you reach a unanimous verdict as to any defendant as to any count, they always answered yes, including the foreperson, including the foreperson that the defense wants to count in the four. They always answered that question yes. We can reach that verdict because that we've done already. Thank you very much for your time. Thank you. You can have one minute. That's it. Your Honor, as to the last point that Mr. Westinghouse made, I don't think it's accurate. His own readout at the bottom of page 3, the court is asking the foreperson the question, do you feel it's reasonable, there's a reasonable probability the jury can reach a unanimous verdict if sent back for further deliberation on any count as to any defendant? I mean, what's unclear about that? That's as clear as day. Now, the other thing that Mr. Westinghouse pointed out at the top of his handout, you'll read, the court asked a very good question, what do you mean by your note when you say we can't agree on each response? The juror said, I meant to say verdict or response. So if you put the words verdict and response into the note, what the foreperson is saying the note meant is we cannot reach a unanimous verdict or unanimous we, the jury, are not unanimous on each verdict and responses. What is unclear about that? You've got a verdict form with a bunch of questions on it. You've got a jury that was instructed quite clearly, Your Honors, that you have to consider the case against each defendant separately and no decision you make on one count as to one defendant controls as to the other. Now, interestingly, there is a Mr. Westinghouse is right. They didn't find a verdict on the conspiracy count as to both defendants. That's because the conspiracy count told them explicitly it was modified. The Ninth Circuit model was not modified to tell them you've got to find them both guilty or you can't find either of them guilty. They knew that. They read the instructions. They're very careful in reading the instructions. What that shows is not that they're confused. It shows they know what they're doing. They knew when they came out that second time and said, Judge, we can't reach a verdict as to any response or verdict. They'd already read that verdict form so carefully. They knew they couldn't find both of them guilty. All right, counsel. You're over. Thank you very much. Thank you. And United States v. America v. Cook is submitted. And this session of the court is adjourned.
judges: Wardlaw, Clifton, Smith